UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02563-TMT

SAVE THE COLORADO;
SAVE THE POUDRE: POUDRE WATERKEEPER;
WILDEARTH GUARDIANS;
LIVING RIVERS;
WATERKEEPER ALLIANCE; and
SIERRA CLUB;

    Plaintiffs,

v.

UNITED STATES BUREAU OF RECLAMATION;
UNITED STATES ARMY CORPS OF ENGINEERS;
COLORADO RIVER WATER CONSERVATION DISTRICT;

    Defendants,

v.

MUNICIPAL SUBDISTRICT, NORTHERN COLORADO WATER
CONSERVANCY DISTRICT;
COLORADO DEPARTMENT OF NATURAL RESOURCES; and
CITY AND COUNTY OF BROOMFIELD;

    Intervenor-Defendants.

---

**ORDER ON PETITION FOR REVIEW OF AGENCY ACTION**

---

    This matter is before the court on Petitioners' Petition for Review of Agency

Action [Docket No. 8] and Petitioners' Opening Brief for Review of Agency Action

[Docket No. 68] challenging Respondents' actions in authorizing the Windy Gap Firming

Project. Petitioners' claims arise under the Administrative Procedure Act (APA), the

National Environmental Policy Act (NEPA), and the Clean Water Act (CWA).  The court has subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

As detailed below, the court reviews the six NEPA claims and one CWA claim brought against the authorization of the Windy Gap Firming Project and finds none merit overturning the agency action.

# I.  Background

Petitioners Save the Colorado, Save the Poudre: Poudre Waterkeeper, Wildearth Guardians, Living Rivers, Waterkeeper Alliance, and the Sierra Club (together "Save the Colorado") challenge Respondents United States Bureau of Reclamation and United States Army Corps of Engineers' plan to site a 90,000 acre-foot (AF) reservoir at Chimney Hollow, near Fort Collins, Colorado, to store Windy Gap Project water on the Front Range and to store Colorado-Big Thompson water.

### A.  The Windy Gap Project

In 1970, six Front Range municipalities—Boulder, Longmont, Loveland, Fort Collins (later transferring its share of water to the Platte River Power Authority), Greeley, and Estes Park—formed the Municipal Subdistrict of the Northern Colorado Water Conservancy District (Subdistrict).  COE00051.[1]  Projecting their water need to be 32,400 AF by 2000, COE00007, the Subdistrict developed the Windy Gap Project, which

---

[1]  The citations to the administrative records in this case are as follows: pages from the Bureau of Reclamation's administrative record are notated as BOR#####, and pages from the Army Corps of Engineers' administrative record are notated as COE#####.

consisted of a 445 AF reservoir, a pumping plant, and a six-mile pipeline to Granby Reservoir.  BOR15251.

Because these structures were on the western side of the Continental Divide, the Subdistrict needed a way to transfer Windy Gap water to the Front Range.  COE00051.  It contracted with the Northern Colorado Water Conservancy District and the Bureau of Reclamation "for the use of any unused capacity in the [Colorado-Big Thompson] system for the carriage of water developed by the Subdistrict on the Western Slope to the participants on the Eastern Slope."  COE00051; *see also* BOR15251.  Though the Windy Gap Project was not a federal project, it still required the following federal actions, which triggered NEPA analysis: conveyance of water through the Colorado-Big Thompson (C-BT) system, right-of-way permits and easements, and issuance of dredge and fill permits. COE00015.  In 1981, Reclamation released the final Environmental Impact Statement (EIS).  COE00001.  It identified the purpose of the Windy Gap Project as supplying the municipal and industrial water needs of the Subdistrict participants, COE00015, and the need as filling the 32,400 AF "short fall" projected by the year 2000.  COE00016.

The Windy Gap Project was constructed and has been in operation since 1985. BOR15251.  But because of either a lack of available storage space in Granby Reservoir or Windy Gap water rights not in priority during drier years, Windy Gap has been unable to provide reliable yields in both wet and dry years—resulting in a firm yield of zero. BOR15255.   As the final EIS for the Windy Gap Firming Project explains:

> While the inability to divert water in dry years was anticipated when the Windy Gap Project was constructed, the inability to divert and store during an extended set of wet years, such as the late 1990s, was not.  Because of the deficiency in deliveries, Project Participants requested that the Subdistrict pursue measures through a joint project to firm Windy Gap water deliveries.  Project Participants determined that a cooperative project was the most efficient means to firm Windy Gap water deliveries rather than each entity developing separate storage for its own share of Windy Gap water.

BOR15256.  To address these issues, the Subdistrict formed the Windy Gap Firming Project.

### B.  The Windy Gap Firming Project

The Subdistrict[2] proposed the Windy Gap Firming Project (WGFP) to "improve the firm yield from the existing Windy Gap water supply."  BOR15247.  "Firming" means to maintain a reliable water supply.  To accomplish this, the Subdistrict's proposed action is the "construction of Chimney Hollow Reservoir to store Windy Gap Project water" and "integration of the [C-BT] and Windy Gap Project operations so that C-BT water can be stored in Chimney Hollow Reservoir."  BOR15247.  This would "require new connections to C-BT East Slope facilities and continued use of C-BT storage and conveyance systems and other existing pipelines, canals and diversions to deliver Windy

---

[2]  The Windy Gap Firming Project Water Activity Enterprise is a water activity enterprise owned by the Subdistrict, organized under Colorado Revised Statutes §§ 37-45.1-101.  BOR15248.  For the sake of simplicity, it is referred to as the "Subdistrict" throughout this order, as it is in Reclamation's EIS.

Gap water to Project Participants."  BOR1527.  Project participants include

municipalities, rural domestic water districts, and an industrial water user.[3]  BOR15248.

In the 2003 Alternative Plan Formulation Report, the Subdistrict characterized the

purpose of the WGFP as "provid[ing] a 'firm' supply of Windy Gap water that the

Participants can rely on in all years, except perhaps in very extreme years such as 2002."

BOR00319.  Because the WGFP involved the operation of the C-BT system and the

issuance of dredge and fill permits, it is a federal action requiring NEPA analysis from

Reclamation and the Corps.

In 2005, Reclamation contracted with ERO Resources Corporation and Harvey

Economics to prepare a Purpose and Need Report, which provided "an independent

evaluation of the estimated current and future water requirements for each Project

Participant, a determination of the need for the proposed project, and supporting material

for use in the preparation of the purpose and need chapter of the EIS."  BOR04496; *see

also* BOR04489 (report).  The Purpose and Need Report concluded that the WGFP

participants would face a firm yield shortage of about 111,000 AF by 2050.  BOR04549.

As stated in the Purpose and Need Report, the WGFP is intended to produce 30,000 AF

of that projected shortage, BOR04552, and to "provide up to 3,000 AF of storage to firm

water deliveries for the Middle Park Water Conservancy District," which is on the

---

[3]  Project participants are: City and County of Broomfield, Central Weld County
Water District, Town of Erie, City of Evans, City of Fort Lupton, City of Greeley, City of
Lafayette, Little Thompson Water District, City of Longmont, City of Louisville, City of
Loveland, Platte River Power Authority, and Town of Superior.  BOR15248–49.

Western Slope.  BOR04498.  In its public notice for the Section 404 permit application submitted to the Corps, the Corps identified the basic project purpose as "water supply" and identified the overall project purpose identically to the Purpose and Need Report. COE04668.

Subsequently, Reclamation and the Corps began a three-stage process for selecting the alternatives to analyze in the draft and final EISs.  This involved the categorization of 170 "elements," or any plan component that could meet all, or part, of the needs of the WGFP.  BOR00332–33; *see also* BOR08527.  After the completion of this process, five alternatives were included for evaluation in the draft EIS.  BOR08527.  These were:

1. Alternative 1 (No Action).  BOR08528.

2. Alternative 2 (Proposed Action) – "The Proposed Action includes construction of a 90,000 AF Chimney Hollow Reservoir, along with the ability to store, or preposition, water in the new reservoir."  BOR08529.

3. Alternative 3 – "[A] combination of a 70,000 AF Chimney Hollow Reservoir on the East Slope and a 20,000 AF Jasper East Reservoir on the West Slope . . . .  A new, 1-mile-long pipeline would connect Jasper East Reservoir to the existing Windy Gap pipeline that delivers water to Granby Reservoir."  BOR08529.

4. Alternative 4 – "[A] combination of a 70,000 AF Chimney Hollow Reservoir on the East Slope and a 20,000 AF Rockwell/Mueller Creek Reservoir (Rockwell Reservoir) on the West Slope . . . .  Deliveries to and

6

from Rockwell Reservoir would require a new connection to the existing

Windy Gap pump station and a new 3.3-mile-long pipeline to Rockwell

Reservoir."  BOR08529.

5.     Alternative 5 – "[A] a combination of a 60,000 AF Dry Creek Reservoir on

the East Slope and a 30,000 AF Rockwell Reservoir on the West Slope,"

requiring the construction of a new 3.4-mile pipeline and a new 2.1-mile

pipeline.  BOR08531.

During the NEPA-required scoping process beginning in 2003, Reclamation held

three public meetings and received about 160 written submissions on potential issues.

BOR17707.  The draft EIS, published in 2008, was made available for a 122-day

extended comment period.  BOR17707.  During that time, Reclamation held two public

meetings and received 1,150 comments during the 122-day period.  BOR17707–08.

Reclamation reviewed, considered, and responded to these comments.  BOR17708.

In 2011, Reclamation issued the final EIS.  BOR15245.  The Proposed Action

remained Alternative 2, which "includes construction of a 90,000 AF Chimney Hollow

Reservoir, along with the ability to store, or preposition, C-BT water in the new reservoir

. . . .  Water would be conveyed to Chimney Hollow Reservoir via a new pipeline

connection to existing East Slope C-BT facilities."  BOR15876.  Among other things, the

final EIS included updates, corrections, minor changes, and responses to comments.

BOR15294; BOR15871.  It also included "additional details on proposed mitigation

measures and the anticipated effectiveness of those measures."  BOR15294.  Because of

these additions, "[s]everal of the mitigation measures require[d] an adjustment in the operation of Alternative 2, the Proposed Action.  This included modifications in prepositioning to maintain higher water levels in Granby Reservoir than under the original plan and a curtailment of WGFP diversions under certain conditions when the stream temperature in the Colorado River exceeds the state standard."  BOR15294.

The NEPA process concluded in 2014 when Reclamation issued its Record of Decision (ROD), which approved the WGFP.  BOR17702.  The Corps participated in the NEPA process as a cooperating agency, BOR17706, and after an independent review, adopted Reclamation's NEPA analysis pursuant to 40 C.F.R. § 1506.3.  COE18535.  Furthermore, the Subdistrict agreed in 2014 to a set of mitigation measures and environmental commitments in connection with both the Windy Gap Project and the Windy Gap Firming Project.  BOR17564; BOR17612; BOR17621–36 (listing the Subdistrict's mitigation and environmental commitments).

In October 2017, a group of organizations—Save the Colorado, Save the Poudre: Poudre Waterkeeper, Wildearth Guardians, Living Rivers, Waterkeeper Alliance, and the Sierra Club—concerned with the NEPA process petitioned for review of the agencies' action. [Docket No. 8.]

Save the Colorado alleges the following six NEPA violations against Reclamation: (1) selection of an impermissibly narrow purpose and need; (2) failure to independently determine the existence of applicant's proposed need; (3) improper exclusion of reasonable alternatives; (4) failure to disclose the shortcomings of its data and methods

8

when determining the Project's impacts; (5) failure to fully analyze the identified environmental impacts; and (6) failure to analyze cumulative and indirect impacts.  Save the Colorado also asserts one claim against the Corps that it violated Clean Water Act requirements.

In its briefing, Save the Colorado presents the following issues for review and identifies in parentheses the claims related to each:

- Whether the Bureau of Reclamation and the Army Corps of Engineers violated NEPA and the Clean Water Act by adopting an impermissibly narrow purpose and need, limited to fixing the broken Windy Gap project, and eliminating practicable alternatives that would not further drain the Colorado River or damage the ecosystem but would meet the true underlying purpose and need of supplying water to front range communities. (Claims 1, 3, 7)

- Whether Reclamation and the Corps violated NEPA and the Clean Water Act by failing to independently verify the Project's purpose and need by reviewing and relying on mere projections instead of available data on actual water use by the participants. (Claims 2, 7)

- Whether Reclamation violated NEPA when it conducted a flawed analysis of the Project, including by not identifying shortcomings in methodology such as failing to disaggregate monthly streamflow data, overestimating current diversions, and relying on improper stream methodology methods. (Claim 4)

9

- Whether Reclamation violated NEPA by failing to identify all indirect and cumulative environmental impacts of the Project, specifically related to the cumulative effects of other diversions such as the Moffat Project, the impacts of climate change or a potential compact call on the Colorado River, and the impacts of increased pumping through Grand Lake on water quality. (Claims 5, 6)

## II.  Standard of Review

Suits alleging violations of NEPA and the Clean Water Act are brought under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.  Pursuant to the APA, the Court must determine whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This scope of review is narrow and deferential; that is, the court is "not to substitute [its] judgment for that of the agency."  *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006); *see also Audubon Soc'y of Greater Denver v. U.S. Army Corps of Eng'rs*, 908 F.3d 593, 603 (10th Cir. 2018).  Thus, the court "confine[s] [its] review to ascertaining whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made."  *Colorado Wild, Heartwood*, 435 F.3d at 1213.

An agency's decision is arbitrary and capricious "if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (internal quotation marks omitted); see also *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1126 (10th Cir. 2020).  "When called upon to review factual determinations made by an agency as part of its NEPA process, short of a 'clear error of judgment' [the court asks] only whether the agency took a 'hard look' at information relevant to the decision." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010).  The "arbitrary and capricious" standard thus requires a "reasoned basis for agency action," which is "supported by the facts in the record."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994).  And, a "presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action." *Hillsdale Env't. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012).  The deference given to an agency action "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.  *Utah Env't Cong. v. Dale Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

# III.  Analysis

The court reviews each of the seven claims for relief and finds none merit overturning the agency action.  The following analysis addresses each claim through the issues as they are presented by Save the Colorado.[4]

### A.  *Purpose and Need Selection and Alternatives Analysis*

Save the Colorado contends that Reclamation and the Corps violated NEPA and the CWA by adopting the Subdistrict's impermissibly narrow purpose and need for the Windy Gap Firming Project—namely, a purpose of fixing the "broken" original Windy Gap Project, rather than a purpose of meeting any legitimate water needs.  [Docket No. 68 at 21.]  This, they argue, "excluded reasonable alternatives from consideration that could meet the Project's underlying purpose and need to supply water to meet the Participants' needs," thus violating NEPA.  [Docket No. 68 at 35.]  And it precluded the Corps from

---

[4]  Save the Colorado's six NEPA claims (Claims 1 through 6) are brought solely against Reclamation.  [Docket No. 8 at 34–40.]  Save the Colorado brings one claim (Claim 7) against the Corps for violation of the CWA.  [Docket No. 8 at 41–42.]  As discussed above, the Corps participated in the NEPA process as a cooperating agency, BOR17706, and after an independent review, adopted Reclamation's NEPA analysis pursuant to 40 C.F.R. § 1506.3.  COE18535.

Throughout this Order, the court often refers to Reclamation and the Corps collectively as "the agencies" because of this cooperative process.  Thus, the reference to the parties as a collective unit is merely a functional one and not a legal one.  In other words, Claims 1 through 6 fail as against Reclamation, and Claim 7 fails as against the Corps.  Any reference to "the agencies" appearing to come to a different conclusion should be disregarded as merely a result of this factual circumstance.

considering alternatives that avoid discharges into the waters of the United States in violation of the CWA.

NEPA requires federal agencies to prepare an EIS prior to taking major federal action. 42 U.S.C. §§ 4321–4370d. NEPA is intended to promote informed decision-making by ensuring agencies "consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003). NEPA imposes procedural requirements rather than substantive ones: "the statute 'merely prohibits uninformed—rather than unwise—agency action.'" *Richardson*, 565 F.3d at 704 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)). "So long as the record demonstrates that the agencies in question followed the NEPA procedures, which require agencies to take a 'hard look' at the environmental consequences of the proposed action, the court will not second-guess the wisdom of the ultimate decision." *Utahns for Better Transp.*, 305 F.3d at 1163 (quoting *Robertson*, 490 U.S. at 350). Thus, "NEPA's mandate is that agencies 'pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives.'" *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1251 (10th Cir. 2019) (quoting *Richardson*, 565 F.3d at 703).

Consequently, NEPA and Council on Environmental Quality (CEQ) regulations require an agency to study, develop, and describe appropriate alternatives to the action.

42 U.S.C. §§ 4332(C)(iii) and (E); 40 C.F.R. §§ 1502.1, 1502.13, 1502.14.  When

assessing an agency's consideration of alternatives, the court uses a reasonableness

standard, "judged with reference to an agency's objectives for a particular project."  *See*

*Richardson*, 565 F.3d at 709.  The CWA also requires alternatives analysis.  In addition to

satisfying NEPA requirements, projects that require a permit issued by the Corps under

the CWA must also comply with Section 404(b)(1) regulations for discharge of dredge

and fill material into waters of the United States.  The regulations specify that "no

discharge of dredged or fill material shall be permitted if there is a practicable alternative

to the proposed discharge which would have less adverse impact on the aquatic

ecosystem, so long as the alternative does not have other significant adverse

environmental consequences."  40 C.F.R. § 230.10.  For purposes of the CWA, an

"alternative is practicable if it is available and capable of being done after taking into

consideration cost, existing technology, and logistics in light of overall project purposes."

*Id.*  And, in terms of identifying a purpose and need for a project, NEPA regulations

(which the Corps must satisfy in addition to CWA regulations) require the Corps to

"exercise independent judgment in defining the purpose and need for the project from

both the applicant's and the public's perspective."  33 C.F.R. pt. 325, App. B(9)(b)(4–5).

 An agency has "wide discretion in defining its objectives and in determining which

alternatives meet those objectives."  *Audubon Soc'y of Greater Denver*, 908 F.3d at 603

(quoting *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1276 (10th Cir.

2013)).  When the federal action is part of a private applicant's project, agencies cannot

"completely ignor[e] a private applicant's objectives" in identifying the purpose and need of the project. *Colorado Env't Coal.*, 185 F.3d at 1175. Indeed, "[w]here the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002).

Furthermore, defining the purpose and need of a project cannot "preclude a reasonable consideration of alternatives." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011). This means that agencies cannot "defin[e] the objectives of the project in terms so unreasonably narrow they can be accomplished by only one alternative." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1278 (10th Cir. 2004) (quoting *Colorado Env't Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999)) (alterations incorporated); *see also W. Watersheds Project*, 721 F.3d at 1276 ("A court may not reject [an agency's] stated objectives unless they are defined so narrowly as to foreclose reasonable options."). For a purpose to be unreasonably narrow, it must "preclude reasonable consideration of alternatives." *Wyoming*, 661 F.3d at 1245.

Short of this, then, agencies are instructed to "take responsibility for defining the objectives of an action and then provide legitimate consideration to alternatives that fall between the obvious extremes. Beyond this, there are no hard and fast rules to guide the alternatives analysis." *Colorado Env't Coal.*, 185 F.3d at 1174–75. For example, the petitioners in *Colorado Environmental Coalition v. Dombeck* urged a similar alternatives

analysis requirement to the one Save the Colorado asserts here.  Colorado Environmental

Coalition argued that the Forest Service's refusal to consider a "Conservation Biology

Alternative" meant its evaluation of alternatives for a ski-area expansion project was

impermissibly narrow.  The Tenth Circuit disagreed.  The panel held that in considering

alternatives to a proposed ski-area expansion, "the Forest Service was fully authorized

within this decision-making context to limit its consideration to expansion alternatives

designed to substantially meet the recreation development objectives of the Forest Plan."

*Id.* at 1175.  This was the case *even though* the "Conservation Biology Alternative" would

have purportedly increased skiable area, added a ski lift, and other recreational

improvements—all of which could have, arguably, furthered recreation development

objectives.  *Id.*

Furthermore, Tenth Circuit precedent does not require agencies to advance

alternatives they believe to be untenable in achieving the stated goals of a project.

"Alternatives that do not accomplish the purpose of an action are not reasonable, and

need not be studied in detail by the agency."  *Audubon Soc'y of Greater Denver*, 908 F.3d

at 603 (internal quotation marks omitted).  "[O]nce an agency establishes the objective of

the proposed action—which it has considerable discretion to define, . . . the agency need

not provide a detailed study of alternatives that do not accomplish that purpose or

objective, as those alternatives are not reasonable."  *Wyoming*, 661 F.3d at 1244 (internal

quotation marks and citations omitted).

### 1.  Purpose and Need Selection

Here, Reclamation and the Corps defined the project's purpose as "firming"—producing a reliable water supply for—the Windy Gap Project.  BOR04498 ("The purpose of the Windy Gap Firming Project is to deliver a firm annual yield of approximately 30,000 AF of water by 2010 from the existing Windy Gap Project to meet a portion of the water deliveries anticipated from the original Windy Gap Project and to provide up to 3,000 AF of storage to firm water deliveries for the Middle Park Water Conservancy District.  Firm water deliveries from the Windy Gap Project are needed to meet a portion of the existing and future demands of the Project Participants.").  Save the Colorado contends the Project's purpose should have been simply "supplying water" to the participants of the Windy Gap Firming Project.

The agencies' selection of the purpose as "firming" the Windy Gap Project was proper.  "Firming" means to maintain a reliable water supply.  Characterizing the Project as making the Windy Gap water supply reliable does not impermissibly narrow the options by which this can be accomplished.  The goal of firming a water supply can be furthered through a number of options other than building reservoirs, including reducing the need for a firm supply through conservation, making interruptible supply contracts, obtaining agricultural leasebacks, and acquiring senior water rights, among others.  The agencies exercised discretion permitted under NEPA, the CWA, and the APA in making a determination to endorse the Subdistrict's goal of increasing the yield of its existing project "rather than develop other water sources" for the Subdistrict's water needs.

17

BOR14603; BOR14821–22; BOR14842.  And, the agencies properly considered the

goals of the private applicant in determining the project's purpose and need, giving

"substantial weight" to the Subdistrict's desire to increase the yield of its existing project.

*See* BOR14603; BOR14821; BOR14842.

Tenth Circuit precedent does not require agencies to base their decisions on a

generalized "underlying purpose" of a project, as Save the Colorado urges.  *See Wyoming*,

661 F.3d at 1244–45 (finding that a stated purpose was not "unreasonably narrow"

because it did not "preclude reasonable consideration of alternatives").  Agencies enjoy

"wide discretion" in their selection of the project's objective,  *Audubon Soc'y of Greater

Denver*, 908 F.3d at 603, and the agencies here not only considered the Subdistrict's

purpose in undertaking the project but also did not foreclose all but one option by which

to accomplish it, *Greater Yellowstone Coal.*, 359 F.3d at 1278. Thus, the agencies' choice

to firm the Windy Gap Project was permissible.

### 2.  Alternatives Analysis

With regard to considering alternatives, Reclamation and the Corps considered and

screened out a number of alternatives to firm the water supply at Windy Gap, including:

non-structural alternatives (unlimited and limited borrowing from the C-BT Project,

modified borrowing of C-BT water, buying C-BT storage, interruptible supply contracts,

purchase/leaseback contracts or dry year options on C-BT units, and prepositioning),

water conservation, other sites for reservoirs, and multiple reservoirs on the east and west

slopes.  *See* BOR00333; BOR00338–39; BOR15301–11.  It is true that the most

extensively considered options all included the construction of at least one reservoir. BOR15301. But the agencies concluded, early in the alternative development process, that nonstructural options were insufficiently firm or long-term. *See* BOR00338.

The Tenth Circuit considered a similar argument in *Audubon Society of Greater Denver* in which the appellants relied on the same case as Save the Colorado does here, *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002). Audubon Society asked the court to find inadequate the Corps' conclusion that while conservation can delay the need for additional water supply, conservation "does not in itself eliminate the need for additional supplies." *Audubon Soc'y of Greater Denver*, 908 F.3d at 604 (internal quotation marks omitted). The Tenth Circuit specifically held that an agency's discussion on current conservation plans and the great future unmet water need "sufficiently explained why the Corps did not consider enhanced water conservation to be a reasonable alternative worthy of further analysis, which is all that NEPA requires." *Id.* Here, the agencies similarly dismissed water conservation and other non-structural options as insufficiently firm to meet the objective of obtaining a firm water supply for the Windy Gap Project. *See* BOR15305–06.

Given that the agencies here sufficiently explained that structural options would best accomplish a reliable source of firm water, the early consideration and dismissal of nonstructural alternatives satisfies NEPA, the CWA, and the APA. The agencies had "wide discretion in . . . determining which alternatives meet [their] objectives." *Audubon Soc'y of Greater Denver*, 908 F.3d at 603 (quoting *W. Watersheds Project*, 721 F.3d at

19

1276).  With a thorough EIS process that considered these alternatives—and the efficacy of these alternatives in accomplishing the goals of the project—the agencies have satisfied their NEPA and CWA obligations.

And "[w]hen an agency decides to exclude an alternative from detailed study, it only needs to briefly discuss the reasons for eliminating the unreasonable alternative from the EIS."  *Id.* (internal quotation marks omitted; alterations incorporated).  The agencies did so here.  Examples follow of the discussions accompanying the dismissal of these options from consideration:

- "Alternatives that clearly would not meet or reasonably contribute to meeting the Participants' water supply requirements were eliminated from further consideration, with the exception of the No Action Alternative, which is required by NEPA.  This criterion did not eliminate potential reservoir storage alternatives, but did eliminate other types of alternatives.  The ability to meet the project purpose and need, including yield requirements, was used again to evaluate alternatives in Level 3 screening."  BOR15302.

- "All nonstructural measures, except prepositioning, were eliminated from further consideration for one or more reasons including conflicts with C-BT operations, adverse impacts on water deliveries to C-BT unit holders, and the inability to firm Windy Gap water."  BOR15305.

- *"Interruptible supply contracts.* These types of contracts are used to provide water in dry years, but do not provide a long-term reliable supply of water to meet the purpose and need of the proposed Firming Project." BOR15305.

- *"Storage in Horsetooth Reservoir.* Dedicating storage space in Horsetooth Reservoir for Windy Gap firming would reduce the storage and yield for the C-BT Project and injure C-BT unit holders. A change in the purpose of the C-BT Project would require Congressional action. This alternative was eliminated from consideration because it would adversely affect C-BT unit holders contrary to Reclamation obligations associated with the establishment of the C-BT Project authorized by Congress." BOR15305.

- *"Water conservation.* Water conservation measures play an important role in reducing demand and extending supplies for each of the Project Participants. Participants have implemented a variety of conservation measures over the past 15 years, which [have] substantially reduced water use. Additional incremental improvements in water conservation in the future are expected to contribute to meeting Participants' future water needs, but conservation alone does not meet all of the projected water supply requirements or eliminate the need for firming existing Windy Gap Project water supplies. . . . Conservation measures will continue to reduce demand and conserve available supplies in the future, but they do not provide an immediate source of water to meet near-term demand projections." BOR15305–06.

21

\* \* \*

Thus, Reclamation and the Corps adopted a reasonable purpose and need and evaluated a sufficient range of alternatives to satisfy NEPA, the CWA, and the APA.

### B. Reliance on Water Use Projections

Save the Colorado next asserts that Reclamation and the Corps failed to independently verify that Windy Gap water is actually needed. This is true, they assert, for several reasons. First, the agencies had not confirmed a need for the 30,000 AF that the Firming Project would provide. The water-need projections contained in the Windy Gap Firming Project – Purpose and Need Report ("Purpose and Need Report") used by the agencies were off-target. BOR04530–49. The 2008 draft EIS relied on projections that nine of the participants would face shortages of firm water supply by 2006—but this had not come to pass by 2008, and the draft EIS did not include updates to the participants' water shortages or surpluses for those years. BOR08577. And the Final EIS, published in 2011, used these same demand projections. BOR15267–90. The agencies' reliance on the outdated projections from the 2005 report, Save the Colorado alleges, failed NEPA's requirement to engage in informed decision-making. Second, Save the Colorado also alleges the agencies arbitrarily and capriciously failed to update projections with actual water use data in the intervening years, preventing informed decision-making.

Reclamation and the Corps assert they properly confirmed that the participants needed Windy Gap Water for several reasons supported in the record of decision (ROD).

First, the Purpose and Need Report, upon which the agencies relied for projected water needs, was an independent evaluation completed by consultants.  BOR04495–96.  Even though the data in the report was largely supplied by the project participants, the study team gathered additional data, evaluated the information provided by the participants, and determined the reliability of both.  *See* BOR04505–08 (detailing methodology).  Second, they assert, the agencies' continued reliance on the purportedly outdated data in the Purpose and Need Report was reasonable because (1) short-term results do not necessarily undermine long-term projections because the latter are normalized to "smooth-out" short cyclical changes and (2) water demand on the Front Range will continue to increase with a growing population even if actual water use lags behind projected water use.  *See* BOR14822; BOR15127; BOR15267.  And, the agencies point out that separate projections in the participants' water conservation plans were, in all but one case, *compare* BOR09528 *with* BOR15278, nearly identical to the projections in the Purpose and Need Report.  BOR14821–23; *compare, e.g.*, BOR05967 *with* BOR15266, BOR06668 *with* BOR15266, BOR09044 *with* BOR04429.  Finally, the agencies suggest that Save the Colorado's reasoning is flawed with regard to the water-use data they indicate because drought conditions at the time it was collected attributes to a lower projection.  *See* BOR09527; BOR09037; BOR09028.

Here, the agencies' reliance on the water use projections in the Purpose and Need Report is not unreasonable by the standards of NEPA, the CWA, or the APA.  The agencies explain that the Purpose and Need Report focused on long-term water use and

need.  BOR14821–22.  The projections were nearly identical in a majority of the

comparisons, as indicated above.  For the one outlier, the difference represented less than

five percent of the total estimated demand.  *Compare* BOR09528 *with* BOR15278.

And the agencies provide reasons for relying on the projections that are neither

arbitrary nor capricious.  *See, e.g.*, BOR14821–22.  Rather, they are rationally based in

long-term statistical modeling.  *Id.*  In light of agency choices that are not irrational, the

Tenth Circuit has held it "cannot substitute [its] views on statistics (including skewed data

and outlier analysis) for those of [an agency] and insist that one measure or another be

used."  *Colorado Wild, Heartwood*, 435 F.3d at 1216.  The agencies here have

sufficiently explained and justified the reliance on the Purpose and Need Report so that it

is neither arbitrary nor capricious.  And given that Tenth Circuit precedent gives

"especially strong" deference to agency action "where the challenged decisions involve

technical or scientific matters within the agency's area of expertise," *Utah Env't Cong.*,

443 F.3d at 739, the court defers to the agencies' choice of water use projections—a

matter squarely within the agencies' expertise.

### C.  Choice of Methodologies

NEPA and the CEQ regulations require agencies to "ensure the professional

integrity, including scientific integrity, of the discussions and analyses in environmental

documents" and "make use of reliable existing data and resources."  40 C.F.R. § 1502.23.

Agencies must "identify any methodologies used and . . . make explicit reference to the

scientific and other sources relied upon for conclusions in the statement."  *Id.*  But the

choice of which methodology to use—as long as it comports with scientific integrity and is reliable—is entitled to deference by the reviewing court.  "An agency has discretion to choose a methodology, so long as it explains why it is reliable."  *Hillsdale Env't Loss Prevention, Inc.*, 702 F.3d at 1178.  As long as the "methodology [has] a rational basis and considered the appropriate factors," the agency does "not act arbitrarily and capriciously by utilizing its chosen methodology."  *Id.*

Save the Colorado contends that Reclamation did not disclose the shortcomings of: (1) using disaggregated monthly stream-flow averages, (2) their overestimation of existing diversions, and (3) their stream morphology analysis.  Each is addressed in turn.

### 1. Disaggregated Monthly Stream-Flow Averages

With regard to the disaggregated monthly stream-flow averages, Save the Colorado asserts that, as commenters noted, variance in *daily* stream flows is important for understanding river health.  The agencies used a model called the Windy Gap Firming Project Model ("WGFP Model"), which was derived from two existing models: the Colorado Decision Support System (CDSS) and the Boyle Engineering Stream Simulation Model (BESTSIM).  *See* BOR15412.  The agencies assert they had a rational basis for using the WGFP Model, which required disaggregation of *monthly* data: namely, that even with the decreased accuracy of the disaggregated monthly flows for low-flow periods, Windy Gap diversions during these periods are typically low and thus results are still reasonably accurate in assessing hydrologic changes.  *See* BOR15412; BOR14668. In other words, the agencies assert that Windy Gap has junior water rights that are

25

generally unable to be filled during low-flow periods, meaning any inaccuracy of the WGFP Model during these periods is trivial.  BOR15412.

The agencies properly assessed the  model's inaccuracy regarding these periods and their continued reliance on the model is reasonable.  This satisfies the "rational basis" requirement for the agencies' choice of methodology in using disaggregated monthly data for stream flows.

## 2.  Estimations of Existing Diversions

The agencies' estimations of existing diversions are similarly supported by the record and by the agencies' rational choice.  Save the Colorado argues that by overestimating existing diversions at 36,532 AF/year, the agencies "make the increased diversions from the Project seem less disruptive than they really are."  [Docket No. 68 at 46.]

The agencies respond that the models applied current conditions to the historic hydrologic record.  *See* BOR18263; BOR06465–66; BOR14961.  Further, they contend that Reclamation responded to the comments raising these purported overestimations by pointing out increasing water demands in recent years.  BOR14591.  And, they argue, the agencies' decision to continue to use the 32,532 AF/year figure was supported by at least three reasons in the administrative record:  (1) it reasonably represents recent operations which include Windy Gap diversions, *see* BOR14665, BOR15404; (2) Save the Colorado's preferred baseline does not account for the considerable amount of water (about 40 percent of diverted water) spilled back into the Colorado River, *see* BOR15665,

BOR15428; and (3) regardless of how baseline diversions are modeled, the Project will not have an adverse effect on low-flow periods, *see* BOR14666.

The court agrees with the agencies that these reasons, supported by the record of decision, are sufficient to find that the agencies' choice of baseline existing diversions is neither arbitrary nor capricious.

### 3. Stream Morphology Analysis

Finally, the agencies' choice of scientific study on stream channel morphology—namely, the Schmidt and Potyondy study—to analyze stream morphology is rationally based and neither arbitrary nor capricious. Save the Colorado asserts that using the Schmidt and Potyondy study was inappropriate because it was not intended to be used on regulated (as opposed to wild) streams; rather, the agencies should have used a 2011 scientific study by Nehring.

The agencies, however, argue this choice was also a reasonable and rational one. They assert the Schmidt and Potyondy study was one of many tools used in assessing stream morphology, including field data, river cross-section analyses, hydraulic modeling, and studies indicating the stability of the stream channel morphology. *See* BOR17597; BOR15483; BOR14837–38. And, using the Schmidt and Potyondy model was appropriate because studies have shown that regulation of the river has not substantially altered its morphology, directly undercutting Save the Colorado's argument against the study's use. *See* BOR14836; COE14610. Finally, the agencies assert that upon review of the Nehring report, they incorporated some of its data regarding impacts on

27

macroinvertebrates.  *See* BOR17717.  But the Nehring report provided no basis to disturb the conclusions on stream morphology because the report included only biological impacts and not physical data to support its statements about stream morphology impacts. *See* BOR17597; BOR17717; COE18609.

Thus, the agencies' decision here is both strongly supported and included in the RODs, satisfying the requirements of NEPA, the CWA, and the APA.

*   *   *

In sum, the agencies' analyses on these issues are both rational and supported by the administrative record.  This satisfies the scientific and procedural requirements of NEPA and the APA with regard to the agencies' choice of methodology and the scientific support for its decisions.

### D.  Identification and Consideration of Cumulative Impacts

#### 1.  Standard of Review

NEPA and the CEQ regulations define *scope* as "consist[ing] of the range of actions, alternatives, and impacts to be considered in an environmental impact statement." 40 C.F.R. § 1508.25 (prior to 2020); *id.* at § 1508.1 (effective September 14, 2020).  At the time the EIS at issue was completed,[5] this required agencies to consider the direct,

---

[5]  In July 2020, the CEQ issued a final rule to update its NEPA regulations, effective September 14, 2020.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020) (to be codified at 40 C.F.R. pts. 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, 1508, 1515, 1516, 1517, and 1518).

(continued...)

indirect, and cumulative impacts of the proposed project.  *Id.* at 1508.25(c).  This is

limited to "reasonably foreseeable" impacts.  *Wyoming*, 661 F.3d at 1251.  And, "[e]ven

as to impacts that are sufficiently likely to occur such that they are reasonably foreseeable

and merit inclusion, the [Final EIS] need only furnish such information as appears to be

reasonably necessary under the circumstances for evaluation of the project."  *Id.*  Thus, in

reviewing the sufficiency of a cumulative-impacts analysis, the court "must examine the

administrative record, as a whole, to determine whether the [agency] made a reasonable,

good faith, objective presentation of those impacts sufficient to foster public participation

and informed decision making."   *Id.* at 1251–52 (quoting *Colorado Env't Coal.*, 185 F.3d

at 1177).

Save the Colorado asserts that the agencies did not adequately evaluate the direct

and cumulative impacts from the WGFP, arguing that they failed to (1) consider the

cumulative impacts of the WGFP in combination with the Moffat Project, (2) conduct an

adequate analysis of the direct impacts of the WGFP with regard to climate change, and

(3) consider how the WGFP might hasten a compact call.  Each is addressed in turn.

---

[5](...continued)
Among other things, this update eliminated 40 C.F.R. § 1508.7, which contained
the definition of "cumulative" cited by Save the Colorado in its briefing.  The final rule
indicated "[t]he regulations in this subchapter apply to any NEPA process begun after
September 14, 2020.  An agency *may* apply the regulations in this subchapter to ongoing
activities and environmental documents begun before September 14, 2020."  Update to
the Regulations, 85 Fed. Reg. at 43,372–73 (emphasis added).  Because the NEPA
process in this matter was completed prior to the effective date of these new regulations
and because both parties thoroughly briefed the issues before the issuance of these
regulatory changes, the court evaluates the claims under the old regulatory scheme.

### 2.  Moffat Collection System

Save the Colorado contends that the agencies did not adequately consider the impacts of the WGFP in combination with the Moffat Collection System Project.  They raise three issues with the agencies' analysis, each of which the agencies respond to.

First, Save the Colorado argues, the effects analysis—which was for surface water hydrology impacts related to the Moffat project—was flawed because the Moffat diversions were overstated in the cumulative effects hydrology in the WGFP's draft EIS, making the diversions for the WGFP seem less disruptive than they are.  The agencies respond that the draft EIS included a 30,000 AF/year "safety factor" for the Moffat project; the final EIS explained that because the modeling for the Moffat project had ultimately omitted the safety factor, the WGFP had overstated the diversions by 30,000 AF/year.  BOR15462.  Thus, because the overstated Moffat project diversions had appeared in the draft EIS, the cumulative impacts for the WFGP actually appeared to have *greater* impact during the decision-making process.

The court agrees with the agencies.  Because the combined diversions from the Moffat project and the WGFP were overstated during the decision-making process, the draft EIS actually presented a scenario with larger effects than the reality reflected in the final EIS.  This did not prevent interested parties from commenting on the combined impact of the two projects, and it fostered public participation while promoting informed decision-making.

Second, the two projects used different models for hydrologic effects assessments: the WGFP used the WGFP Model, which provides monthly data as discussed above, and the Moffat Project used the Platte and Colorado Simulation Model (PACSM), which provides daily data.  This, Save the Colorado asserts, was a harmful error that deprived the public of informed input and meant that the agencies did not articulate a rational connection between the facts found and the decision made.  The agencies respond Reclamation determined that while the PACSM model does provide daily data, it still was not as detailed in operation as the WGFP Model.  BOR03074.  The agencies reiterate that the need to disaggregate data with the WGFP Model did not prevent it from being an effective analysis tool.  *See* WGFP Model discussion, *supra*.  And, in a report included in the ROD, the agencies ran a comparison of the two models and found that they produced "virtually the same flow" in the relevant river basin.  BOR15418.

Again, the court agrees with the agencies that they presented reasonable and objective impacts of the two projects with regard to model choice, and their choice of model (as discussed above) was rational.  The presentation of this data in the draft EIS thus appropriately furthered the public participation and informed decision-making goals of NEPA.

Finally, Save the Colorado contends that the geographic scope of the study area was too limited because it did not study surface water hydrology below Kremmling, Colorado.  But, as the agencies respond, this decision was supported by studies in the ROD demonstrating that the WGFP effects "diminish substantially below Kremmling."

31

BOR14809.  This is supported by the studies showing effects on trout, stream

morphology, and stream temperature diminish significantly by Kremmling or above in the

stream-flow.  *See* BOR15622–23; BOR15495; BOR15579.  Thus, the agencies properly

considered and supported their choice in geographic area for cumulative analysis.

In sum, the agencies adequately considered the cumulative impacts of the Moffat

project and the WGFP in their decision-making process.

### 3.  Climate Change

Save the Colorado asserts that the agencies' purely qualitative analysis on the

impacts of climate change was inadequate, relying on the D.C. District's decision in

*WildEarth Guardians v. Zinke*.  368 F. Supp. 3d 41, 76 (D.D.C. 2019).  In that case, the

court concluded the Bureau of Land Management's failure to quantify greenhouse gas

emissions from their leased parcels meant that the cumulative impacts analysis was

inadequate—namely, because there was no comparison to regional and national emissions

from the leased parcels.  But Save the Colorado's reliance is misplaced.  The impact of

greenhouse gas emissions on climate change is far different than the impact of climate

change on a junior water right diverted from the Colorado River.  And, as the agencies

point out, *WildEarth Guardians* dealt with the impact of a proposed agency action on

climate change, not the impact of climate change on a proposed action.

Furthermore, though Save the Colorado asserts that commenters on the draft EIS

provided several easily applicable "key climate change studies" that would have allowed

for a quantitative analysis, the agencies persuasively argue these studies do not provide

for analysis at a regional level and generally do not allow for quantification in the WGFP Project analysis. *See* BOR08649 (discussing decision to address climate change in a purely qualitative manner); BOR15454; BOR15007. A qualitative look at the general trends and forecasts of these studies—including water temperature trends—was sufficiently rational for the analysis when the outcomes are unpredictable and generalized regarding the impacted area. *See, e.g.*, *Cent. Oregon Landwatch v. Connaughton*, 696 F. App'x 816, 819 (9th Cir. 2017) ("[W]e allow agencies to describe environmental impacts in qualitative terms when they explain their reasons for doing so and why objective data cannot be provided.") (internal quotation marks omitted); *see also* BOR15348–50 (discussing climate change); BOR15453–54 (discussing climate change impacts on surface water hydrology).

Thus, the court agrees with the agencies that a qualitative analysis on the cumulative impacts of climate change on the WGFP was sufficiently rational under the requirements of NEPA.

### 4. Potential Compact Call on the Colorado River

Save the Colorado asserts Reclamation[6] failed to consider how the Project, in conjunction with other diversion projects and with increased drought conditions due to climate change would increase the risk of a compact call. But in their reply brief, Save the Colorado appears to concede that concerns about the WGFP project's impacts on a

---

[6] Save the Colorado alleges these violations against Reclamation—and not the Corps—in its Fifth and Sixth Claim for Relief. [Docket No. 8 at ¶¶ 204, 211–12.]

compact call were not previously raised to Reclamation in its NEPA process. [Docket No.

87 at 21.]  Because Save the Colorado did not raise this particular objection to the draft

EIS, Reclamation "was not given the opportunity to examine any proposed alternatives to

determine if they were reasonably available."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S.

752, 764 (2004); *see also Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1051 (10th Cir.

2015) (holding a claim waived because no commenter had objected to an agency's failure

to consider the cumulative impacts of oil pipelines).  Thus, this argument is waived.

    But even if these claims were not waived, Save the Colorado lacks standing to

bring them.  Standing has three elements.  First, "the plaintiff must have suffered an

injury in fact" that is "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)

(internal quotation marks omitted).  Second, "there must be a causal connection between

the injury and the conduct complained of—the injury has to be fairly traceable to the

challenged action of the defendant, and not the result of the independent action of some

third party not before the court."  *Id.* (internal marks omitted; alterations incorporated).

Third, it must be likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision.  *Id.* at 561 (internal quotation marks omitted).  And, an

organization "has standing to bring suit on behalf of its members when its members

would otherwise have standing to sue in their own right, the interests at stake are germane

to the organization's purpose, and neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Save the Colorado's claim—that the WGFP will contribute to a hastening of a compact call—fails with regard to the first element.  Save the Colorado does not allege that either its constituent organizations or their members have water rights that would be impacted by a compact call.[7]  Of the affidavits submitted by Save the Colorado to establish the impacts of the WGFP, none of them are from individuals (or organizations) with water rights that would be impacted.  The following represents the statements in the affidavits that come closest to alleging that any of the organizations' members have such rights:

- Docket No. 68-1, Decl. of Gary Wockner, ¶ 3 (filed May 23, 2019) ("Save the Colorado has approximately 350 members across the southwestern United States, some of whom live, work, and recreate on and near the Colorado River and/or receive water from the Colorado River.")

- Docket No. 68-2, Decl. of John Weisheit, ¶ 10 (filed May 23, 2019) ("In these and many other ways, Living Rivers depends on the implementation of the CWA and NEPA through permits to protect waterways and the people,

---

[7] A compact call on the Colorado River would result in water rights in the Upper Basin states (Colorado, Wyoming, Utah, and New Mexico) being curtailed in order to meet the water delivery requirements to the Lower Basin states (California, Arizona, and Nevada).  Each state—not its individual water users—will determine how to deliver its obligated amount of water in the case of a compact call.  *See* Colo. Rev. Stat. § 37-61-101 (2020).

including myself and our contributing members, who depend on clean water for

recreation, fishing, rafting, economic growth, food production, and other water

uses that sustain our way of life, health, and well-being.")

- Docket No. 68-3, Decl. of Daniel E. Estrin, ¶ 13 (filed May 23, 2019) ("In

   these and in many other ways, Waterkeeper Alliance and Waterkeeper Member

   Organizations depend on proper NEPA procedures and the implementation of

   the CWA through Section 404 permits to protect waterways.  Members of our

   U.S. Waterkeepers also depend on clean and plentiful water for recreation,

   fishing, rafting, economic growth, food production, and other water uses that

   sustain our way of life, health and well-being.")

- Docket No. 68-7, Decl. of Wade Graham, ¶ 5 (filed May 23, 2019) ("Because

   of the importance of the Colorado River to me, I am also on the Board of

   Trustees of the Glen Canyon Institute.  Every year, we host a River

   Rendezvous alongside Save the Colorado above the Glen Canyon Dam, where

   we meet to see the river returned to its natural state because of the low levels of

   Lake Powell.  While the low flows leading to the reduced level of Lake Powell

   have not been ideal, they have at least allowed us to see a reach of the river as

   it should be.  Even lower flows can defeat this benefit.  In 2018, because of

   exceedingly low flows in the Colorado River, we had to cancel the

   Rendezvous, I expect we will have to cancel it more in the future due to low

   flows resulting in part from the Firming Project.")

36

- Docket No. 68-7, Decl. of Wade Graham, ¶ 7 (filed May 23, 2019) ("Finally, reduced flows on the Colorado River as a result of upstream diversions by the Firming Project will increase the likelihood of a Colorado River Compact Call. The Call would mean all flows in the Colorado River would be at their minimum, and this would further impair my ability to use the Colorado River.")

None of these represent concrete or particularized injuries that would be impacted by a compact call.  In other words, there are no affidavits from water users—or their organizational representative—whose rights will be curtailed by a compact call.  Nor are they state officials or state entities who will be responsible for managing the delivery of water to Lower Basin states in the case of a compact call.  *See* Colo. Rev. Stat. § 37-61-101, art. VI (2020) (allowing governors of states within the Compact to appoint commissioners with the "power to consider and adjust" claims and controversies); Colorado River Drought Contingency Plan Authorization Act, Pub. L. 116-14 (April 16, 2019) (congressional approval of the Drought Contingency Plan).  The statement, for example, that some of Save the Colorado's members "live, work, and recreate on and near the Colorado River and/or receive water from the Colorado River" does not sufficiently allege water rights that would be impacted by a compact call or by the drought contingency plan. [Docket No. 68-1, Decl. of Gary Wockner, ¶ 3 (filed May 23, 2019).] And some of the Save the Colorado members may live in Lower Basin states, which *benefit* from a compact call.  Even assuming that the risk of a compact call is "actual or

imminent," Save the Colorado does not bring the claims of individuals or entities whose cognizable water rights will be impacted.

Furthermore, and as a practical matter, a compact call may actually benefit many of the uses of the Colorado River that the affidavits indicate. In the event of a compact call, the functional effect is the Upper Basin states will be required to meet their minimum delivery requirements to the Lower Basin. In that case, water users in Upper Basin states will be curtailed from diverting water from the River to fill their rights. Logically, then, there will be more water in the Colorado River in the Upper Basin (than there would otherwise be) until water delivery requirements are met downstream. It stands to reason that with fewer diversions and consumptive uses during this period, fishing, recreation, enjoyment for esthetic reasons, and other non-consumptive uses will—at a minimum—not be impacted by the fact of a compact call's existence.

And there is no indication that Save the Colorado meets either of the other two elements of standing. Save the Colorado does not allege a direct, causal connection between the WGFP and the hastening of a compact call. The WGFP does not implicate new water rights—only new ways to store the existing water rights unable to be filled currently. Nor is the injury of a potential compact call "fairly traceable" to the selection of the preferred alternative here—rather, a compact call would be the "result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted; alterations incorporated). Indeed, a compact call would be the result of independent actions of *many* third parties, such as the state officials

38

charged with the administration of water rights under the Compact. *See* Colo. River

Compact (1922), Art. V; Upper Colo. River Basin Compact (1948), Arts. IV, V, VI, VII,

VIII.  Further, it is speculative that the injury here—slowing a potential compact

call—will be redressed by a favorable decision by the court.  The water rights involved in

the WGFP already exist; the WGFP was proposed to simply make them usable.  Even a

favorable decision here for Save the Colorado will not undo the existing allocation of

Windy Gap water.

Because Save the Colorado lacks standing to bring a claim for review of the

agencies' action with regard to cumulative impacts on a compact call, the court lacks

jurisdiction to address this issue.

### 5.  Water Quality in the Three Lakes System

Finally, Save the Colorado asserts that the agencies failed to adequately consider

impacts to water clarity and quality of the WGFP project on the Three Lakes System.

First, Save the Colorado points out that a comment on the draft EIS discussed the

reduction of water clarity resulting from inflows of chemically affected and silt-laden

water into Grand Lake, which increased pumping for the WGFP project would

exacerbate.  The agencies respond that, in addition to an extensive Lake and Reservoir

Water Quality Technical Report addressing direct and cumulative effects, *see* BOR07905,

the agencies are also working with the relevant conservancy district to evaluate

modifications to pumping for the C-BT pipeline, upon which the WGFP will rely.

BOR14851.  This partnership is reflected in the administrative record and was in response

to comments on this issue.  Thus, the agencies have not only considered and analyzed this issue but have improved their response to it—the type of improvement to agency decision-making NEPA is intended to promote.

The same is true for Save the Colorado's second argument here, which is that the process failed to adequately consider the impact of wastewater treatment plants in the Three Lakes System area.  Not only did the agencies consider the issue, *see* BOR14650, BOR14828, but they also required project participants to submit a nutrient reduction plan to help reduce nutrient loading from wastewater and imposed a monitoring process. BOR15593–94; BOR14828–29; BOR17240–41.  The agencies have thus easily met the NEPA requirements here.

## IV.  Conclusion

For the above-stated reasons, it is ORDERED the agency decision is AFFIRMED, judgment shall enter in favor of Respondents, and this case shall be closed in its entirety.

Dated December 10, 2020          BY THE COURT:

_____

Hon. Timothy M. Tymkovich